UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **JANIE SARRADET** | **CIVIL ACTION** |
| **VERSUS** | **NO. 16-80-EWD** |
| **RIVERBEND ENVIRONMENTAL SERVICES, LLC, ET AL.** | **CONSENT CASE** |

### RULING AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Before the Court is a Motion for Summary Judgment (the "Motion"), filed by defendants Riverbend Environmental Services, LLC ("Riverbend"), R.E. Services, Inc., Singleton "Mac" McInnis, III ("McInnis"), and Andrew Densing ("Densing")(collectively, "Defendants").[1] The Motion is opposed[2] and Defendants have filed a reply.[3]

For the reasons set forth herein, Defendants' Motion for Summary Judgment is **GRANTED in part** and **DENIED in part.** The Motion is **DENIED** to the extent Defendants seek dismissal of Plaintiff's breach of contract claim concerning Defendants' refusal to recognize that Plaintiff earned a two percent equity interest in Riverbend during the course of her employment. To the extent Defendants seek dismissal of the remainder of Plaintiff's claims for breach of contract, alleged violations of the Louisiana Unfair Trade Practices Act ("LUTPA") and intentional interference with a contract, the Motion is **GRANTED** and those claims are **DISMISSED with prejudice.**[4]

---

[1] R. Doc. 20.
[2] R. Doc. 21.
[3] R. Doc. 28.
[4] On June 3, 2016, the parties consented to proceed before a United States Magistrate Judge and the case was transferred to the undersigned for all further proceedings and entry of judgment pursuant to 28 U.S.C. § 636(c). R. Docs. 11 & 12.

I.  **Background**

On or about February 5, 2016, Plaintiff filed a Complaint in this Court against Defendants asserting claims for breach of contract, unpaid wages under Louisiana Wage Payment Statutes ("LWPS"), La. R.S. 23:631, *et seq.*, unfair trade practices under the LUTPA and intentional interference with a contract.[5] Plaintiff alleges that on or about March 29, 2012, she was hired as the Business Development Manager for Riverbend.[6] Riverbend is a limited liability company that owns a landfill in Fayette, Mississippi for the disposal of solid and special waste, as well as three transfer stations in Louisiana and Mississippi where waste is temporarily stored for delivery to the landfill.[7] The initial terms and conditions of the Business Development Manager position were set forth in an offer letter dated March 29, 2012 (the "offer letter"), which the parties ultimately signed.[8] Under the terms of the offer letter, Riverbend agreed to pay Plaintiff an annual base salary of $85,000, commissions at a rate of two percent on new and existing business and Plaintiff was also eligible to receive a one percent equity interest in Riverbend the first year annual "gross landfill revenue" exceeded $5 million, another one percent equity interest if "annual landfill revenue" reached $6 million, "and at $7m another 0.5 percent equity will be granted to max out at 2.5 percent."[9]

The Complaint alleges that in 2014, Riverbend "arbitrarily and capriciously and without cause unilaterally reduced Plaintiff's commission on new and existing business by fifty percent in violation of the written agreement between the parties."[10] Plaintiff also alleges that Riverbend withheld her commissions and never provided or paid Plaintiff her equity interest in the company

---

[5] R. Doc. 1.
[6] R. Doc. 1 at ¶ 4.
[7] R. Doc. 20 – 3 at ¶¶ 3-4.
[8] *See*, R. Doc. 20-3 at pp. 5-6 and R. Doc. 21-7.
[9] R. Doc. 20-3 at pp. 5-6.
[10] R. Doc. 1 at ¶ 8.

when Riverbend obtained the targeted "gross landfill revenue" pursuant to the terms of the offer letter. According to Plaintiff, the Defendants engaged in a "fraudulent bait and switch scheme in which Plaintiff was enticed to come work for Defendants in exchange for monetary incentives once goals were achieved," but when Plaintiff reached those goals Defendants refused to perform their obligations under the employment contract.[11] As a result, Plaintiff seeks damages for, among other things, lost income, lost commissions and lost equity interest. Plaintiff also asserts claims against individual defendants McInnis and Densing, the managers of Riverbend, alleging that McInnis and Densing "conspired to perform the bad faith bait and switch scheme," which negates any corporate immunity they seek to assert in this case.[12]

On May 26, 2017, Defendants filed the instant Motion for Summary Judgment.[13] Defendants argue that Plaintiff's breach of contract claims should be dismissed because the undisputed evidence shows that Riverbend did not breach any terms of the offer letter.[14] Defendants also seek dismissal of Plaintiff's remaining claims under the LUTPA and for intentional interference with a contact. First, Defendants contend that because Plaintiff's breach of contract claims fail as a matter of law, Plaintiff's intentional interference with a contract claim necessarily fails, as well.[15] Defendants further assert that McInnis and Densing, as managers of a limited liability company,[16] cannot be held liable for intentional interference with a contract, which is a claim that must be directed at an individual corporate officer.[17] Finally, Defendants assert that Plaintiff's LUTPA claim should be dismissed because it is not within the scope of activity

---

[11] R. Doc. 1 at ¶ 15.
[12] R. Doc. 1 at ¶ 19-22.
[13] R. Doc. 20.
[14] R. Doc. 20.
[15] R. Doc. 20-1 at p. 16.
[16] *See*, R. Doc. 20-3 at ¶ 2.
[17] R. Doc. 20-1 at p. 17 (citing *Magnolia Financial Group v. Antos*, CV 15-7144, 2016 WL 7407174, at *3 (E.D. La. Dec. 22, 2016) (citations omitted)).

3

protected by the LUTPA. In opposition, Plaintiff asserts the Motion to Dismiss should be denied because there are genuine issues of material fact with respect to each of the claims raised in her Complaint.[18]

## II.    Law and Analysis

### A.  Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). "A dispute regarding a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party." *Moreland v. United States*, 3:11-CV-358-L, 2013 WL 3283700, at *1 (N.D. Tex. June 28, 2013) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). Once the moving party has demonstrated the absence of a material fact issue, the party opposing summary judgment may not rest on the mere allegations of his pleadings and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). When considering summary judgment evidence, the court must view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). However, the court must "not weigh the evidence or evaluate the credibility of witnesses." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

---

[18] R. Doc. 21.

**B. Genuine Issues of Material Fact Exist with Respect to Plaintiff's Breach of Contract Claim and Whether Plaintiff Earned a Two Percent Equity Interest in Riverbend**

In the Complaint, Plaintiff asserts that she earned a one percent equity position in Riverbend for the year 2013 and earned another one percent equity position in Riverbend for the year 2014 because gross landfill revenues exceeded the targets established in the offer letter in those years. Plaintiff relies on Defendants' financial documents which show that Riverbend's "Total Income/Gross Profit" was $5,201,036.88 in 2013 and $6,239,365.88 in 2014.[19] Defendants counter that Plaintiff did not earn any equity interest in Riverbend because Plaintiff erroneously relies upon Riverbend's gross revenue without the deduction of transfer station expenses.[20] Although the offer letter does not define the phrase "gross landfill revenue," nor specify the manner in which "gross landfill revenue" is to be calculated, Defendants have submitted a Declaration from Densing to show that Defendants intended for the amount to be calculated by deducting the transfer station expenses, which is why the qualifying word "landfill" was included in the offer letter.[21]

All parties rely on the offer letter with regard to their arguments about whether or not Plaintiff should have a two percent equity position in Riverbend. The offer letter states the following with regard to Plaintiff acquiring an equity position:

> 4. Equity: The first year the company exceeds $5m in gross landfill revenue the company will offer a 1 percent equity position. At $6m annual landfill revenue, another 1 percent will be granted, and at $7m another 0.5 percent equity will be granted to max out at 2.5 percent.[22]

---

[19] *See*, R. Doc. 21-8.
[20] The transfer stations are buildings where waste is temporarily stored for delivery to the landfill. According to Defendants there are more expenses associated with waste deposited at the transfer stations because Riverbend is responsible for transporting that waste from the transfer stations to the landfill. R. Doc. 20-1 at p. 2.
[21] R. Doc. 20-1 at p.14.
[22] R. Doc. 20-3 at pp. 5-6.

The parties also agree that whether Plaintiff is entitled to a two percent equity position in Riverbend turns on the meaning of the phrase "gross landfill revenue."

A federal court sitting in diversity applies the substantive laws of the forum state. *Learmonth v. Sears, Roebuck and Co.*, 710 F.3d 249, 258 (5th Cir. 2013)(citations omitted).

> Under Louisiana law, a contract is ambiguous when the contract is 'uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.' *Shocklee v. Massachusetts Mut. Life Ins. Co.*, 369 F.3d 437, 440 (5th Cir. 2004), *citing In re Liljeberg Enterprises, Inc.,* 304 F.3d 410, 440 (5th Cir. 2000) (internal quotation marks and citations omitted). When a contract is ambiguous, 'the agreement shall be construed according to the intent of the parties.' *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007), *citing Kuswa & Assocs., Inc. v. Thibaut Constr. Co.,* 463 So.2d 1264, 1266 (La.1985). 'Intent is an issue of fact which is to be inferred from all of the surrounding circumstances.' *Guidry*, 512 F.3d at 181, *citing Kuswa & Assoc.*, 463 So.2d at 1266 (emphasis added); *see also Liberty Mut. Ins. Co. v. Pine Bluff Sand & Gravel Co.*, 89 F.3d 243, 246 (5th Cir. 1996) ('[A]mbiguity in the terms of a contract gives rise to a fact question concerning the intent of the parties.'). Therefore, the Fifth Circuit has held 'when a contract is ambiguous, the trier of fact must resolve the factual issue of intent, and judgment on the pleadings or summary judgment is improper.' *Guidry*, 512 F.3d at 181, *citing Investors Syndicate of Am., Inc. v. City of Indian Rocks Beach*, 434 F.2d 871, 877–78 (5th Cir. 1970) (finding that dismissal on the pleadings was error when the contract at issue was ambiguous); *Gertler v. City of New Orleans*, 881 So.2d 792, 796 (La.Ct.App. 2004) ('If the language of [a contract] is ambiguous or susceptible to multiple interpretations, the intent of the parties must be determined and summary judgment is inappropriate.')."

*Drill Cuttings Disposal Co. v. Kem-Tron Techs., Inc.*, No. CIVA 08-1837, 2010 WL 1005923, at *2 (W.D. La. Mar. 15, 2010).

Applying these rules to the provision of the offer letter regarding Plaintiff's acquisition of an equity interest in Riverbend precludes summary judgment in favor of Defendants. The offer letter does not specify the manner in which "gross landfill revenue" is to be calculated. While

Plaintiff states she believed the phrase "gross landfill revenue" referred to Riverbend's "Total Income" or "Gross Profit," Defendants believed that "gross landfill revenue" referred to Riverbend's annual gross revenue less transfer station expenses.[23] Although Defendants allege that, "Densing intended to deduct transfer station expenses when calculating annual gross landfill revenue for purposes of evaluating any equity position under the offer letter,"[24] the only evidence of that intent is contained in Densing's self-serving Declaration that was submitted with the Motion for Summary Judgment.[25]

"Gross revenue" is defined as "receipts of a business before deductions for any purpose except those items specifically exempted." *Gross revenue*, BLACK'S LAW DICTIONARY (6th ed.) The phrase "net revenues" refers to "net income or net profits." *Net revenues*, *Id*. "Net profits" is defined as "Profits after deduction of all expenses; may be classified as net before or after taxes. Deducting the cost of goods sold from sales gives the *gross profit*. Deducting the operating expenses (overhead) from gross profit gives the *operating profit*. Deducting income taxes from operating profits gives the *net profit*. *Net Profits, Id.* (emphasis in original).

It is not evident from the face of the offer letter that the word "landfill" was a qualifying word used to limit the meaning of "gross revenue" to the revenue generated by the landfill less the transfer station expenses. Defendants stress that, "Under Louisiana law, every word in a contract should be given full effect in the absence of absurd results" and that Plaintiff's interpretation of the phrase "gross landfill revenue" fails to give effect to the qualifying word "landfill."[26] However, Defendants' interpretation of "gross landfill revenue" similarly fails to give meaning to the qualifying word "gross," which implies that the amount would be calculated without making any

---

[23] R. Doc. 20-1 at p.14.
[24] R. Doc. 20-1 at p. 14.
[25] *See*, R. Doc. 20-3 at ¶ 26.
[26] R. Doc. 20-1 at pp. 14-15.

7

deductions. This ambiguity precludes summary judgment on the issue of whether Plaintiff earned a two percent equity interest in Riverbend.[27]

### C. Defendants are Entitled to Summary Judgment on the Remainder of Plaintiff's Claims

#### 1. Plaintiff's Breach of Contract Claims Regarding Commissions

Plaintiff alleges Defendants breached the terms of the offer letter with regard to commission payments in two ways: 1) by calculating commissions on revenue for waste deposited less transfer station expenses; and 2) by reducing her commission rate from the 2% rate contained in the offer letter to 1% in July 2014.

##### a. Plaintiff's Breach of Contract Claim Regarding the Calculation of Plaintiff's Commission

With regard to whether Plaintiff's commissions should have been calculated before or after reduction for transfer station expenses, Defendants claim that they always intended for Plaintiff's commissions to be calculated using the "gross landfill revenue," which according to Defendants is the revenue for waste deposited at the transfer stations less the transfer station expenses, plus the revenue for waste deposited directly at the Fayette Landfill less tonnage taxes.[28] Defendants assert that the offer letter did not specify how the commissions would be calculated and under Louisiana law, "a doubtful provision must be interpreted in light of the nature of the contract, equity, usages, [and] the conduct of the parties before and after the formation of the contract . . . ." La. Civ. Code art. 2053. According to Defendants, Plaintiff received her first commission payment on October

---

[27] Densing's own Declaration appears inconsistent with regard to the meaning of "gross landfill revenue." In Paragraph 10 when discussing the calculation of commissions, Densing says "gross landfill revenue included revenue for waste deposited at the transfer stations less transfer station expenses plus revenue for waste deposited directly at the Fayette landfill less tonnage taxes." In Paragraph 12, Densing says that he "intended to deduct transfer station expenses when calculating annual gross landfill revenue for purposes of evaluating any equity position under the offer letter." Thus, it is not clear for purposes of determining whether Plaintiff qualified for an equity interest whether tonnage taxes were also intended to be excluded, but the mere fact there appear to be two different definitions of "gross landfill revenue," even according to Densing, makes summary judgment on this issue inappropriate.
[28] R. Doc. 20-1 at p. 4.

8

18, 2012, for the month of September 2012, along with a worksheet detailing the calculation of her commission payment, which specified that transfer station expenses were being deducted from the commissions.[29] Defendants claim that Plaintiff testified during her deposition that upon receiving that commission worksheet, Plaintiff asked Densing about the deduction of transfer station expenses, and that Densing explained that the commissions were calculated based on the "gate rate," which is determined by deducting transfer station expenses.[30]

Despite Plaintiff's knowledge that transfer station expenses were being deducted from her commission payments, Plaintiff continued to accept the commission payments as calculated by Densing without further argument. As with Plaintiff's first commission payment, Defendants have submitted evidence in support of the Motion to show that every subsequent commission payment included a worksheet detailing the commission calculation for the applicable month (showing a reduction for transfer station expenses).[31] Plaintiff received approximately 36 commission payments,[32] totaling over $123,000, during the nearly three and a half years of her employment with Riverbend.[33] According to Defendants, Louisiana courts have rejected a plaintiff's claim for additional compensation based on alleged miscalculations of their compensation under similar circumstances.[34] As such, Defendants contend Riverbend did not breach the terms of Plaintiff's offer letter by deducting transfer station expenses from her commission payments. Plaintiff argues that Defendants seek to improperly use parole evidence to vary the terms of the offer letter.[35]

---

[29] R. Doc. 20-1 at p. 4.
[30] R. Doc. 20-1 at p. 4 (*citing* R. Doc. 20-4 at pp.18-20).
[31] The commission payment worksheets also show a reduction of landfill revenue for tonnage taxes. *See e.g.,* R. Doc. 20-3.
[32] R. Doc. 20-1 at p. 9 (*citing* R. Doc. 20-4 at pp. 24-25, 27).
[33] R. Doc. 20-1 at p. 9 (*citing* R. Doc. 20-4 at pp. 21-22).
[34] R. Doc. 20-1 at p. 10 (citing *Gamble v. D.W. Jessen & Associates*, 509 So.2d 1041, 1043 (La. App. 3d Cir. 1987); *Forest v. Roy*, No. 2011-1463, 2012 WL 1108882 (La. App. 3 Cir. 4/4/12)).
[35] R. Doc. 21-1 at p. 9-10.

Louisiana courts have rejected a plaintiff's claim for additional compensation where the plaintiff did not challenge the salary calculation until after his employment was terminated. In *Gamble v. D.W. Jessen & Associates*, the plaintiff sought an award for back compensation based upon the alleged miscalculation of his salary during his 30 years of employment with the defendant law firm. 509 So.2d 1041, 1042 (La. App. 3 Cir. 1987). The *Gamble* court pointed out that plaintiff had never questioned the method by which his salary was calculated even though, "Mr. Gamble periodically reviewed with the accountants the financial information of the business and had complete access to all of the business records of the firm located at the office, which he also reviewed from time to time." *Id.* at 1043. The court held that, "One of the best ways to determine what the parties intended in a contract is the method in which the contract is performed, particularly if done consistently over and over again for a period of many years." *Id.* (citations omitted); *See, Total Minatome Corp. v. Union Texas Products Corp.*, 33,433 (La. App. 2 Cir. 8/23/00), 766 So.2d 685, 689 (same); *Spohrer v. Spohrer*, 610 So.2d 849 (La. App. 1 Cir. 1992) (same). In *Gamble*, the court found that the plaintiff had accepted his salary based on the calculations rendered by an accountant and that it was only after the parties had dissolved their relationship that Mr. Gamble objected to the method of calculation. The court ultimately concluded that, "[S]ince Mr. Gamble drew his agreed upon salary throughout the existence of the relationship between the parties, his claim for additional compensation should be and the same is hereby denied." 509 So.2d at 1043.

The plaintiff in *Forest v. Roy* similarly alleged that he had been underpaid during the 12 years that he had practiced medicine with the defendant. 2011-1463, 2012 WL 1108882, at *1 (La. App. 3 Cir. 4/4/12). The court in *Forest* found no manifest error in the trial court's decision denying plaintiff's claim for unpaid wages. 2012 WL 1108882, at *2. The trial court had found that although the plaintiff had access to the financial records of the medical clinic where he was

10

employed, the plaintiff did not question the calculation of his compensation until after he decided to leave the clinic. *Id.* The trial court concluded that, "The calculation of Dr. Forest's compensation did not waiver over the course of his relationship with The Urology Clinic and Dr. Roy. Therefore, his claim for compensation for the time period January 1, 1997 through December 31, 2007 is hereby denied." *Id.* On appeal, the *Forest* court held, "Dr. Forest, a stockholder, officer, and director of the corporation which employed him, had access to all financial records and had the opportunity, routinely, to study and question the calculation of his compensation. He chose not to do so. We cannot say the trial court erred in rejecting his claims." *Id.*

In the instant case, the offer letter does not specify the method for calculating Plaintiff's monthly commission payments. Thus, the contract contains "a doubtful provision" that "must be interpreted in light of the . . . conduct of the parties." La. Civ. Code art. 2053. The conduct of the parties before and after formation of Plaintiff's employment contract demonstrates that the parties intended for Plaintiff's commission to be calculated by deducting the transfer station expenses. Plaintiff testified during her deposition that she realized the transfer station expenses would be deducted from her monthly commission payments when she received her first commission payment in October 2012 and a worksheet showing how her commission was calculated.[36] Plaintiff also testified that she received a similar worksheet with every commission payment that she received, which totaled 36 during the course of her employment with Riverbend.[37] It is also undisputed that with the exception of the first commission payment received in October 2012, Plaintiff did not object to any of the remaining 35 commission payments that she received from Riverbend. As in *Gamble* and *Forest*, Plaintiff accepted each of the 36 commission payments that she received and did not challenge the calculation those payments until *after* her employment with

---

[36] R. Doc. 20-4 at pp. 17-23.
[37] R. Doc. 20-4 at pp. 21-25.

11

Riverbend was terminated. By accepting the commission payments, Plaintiff acquiesced to the method used by Defendants to calculate her commission payments. As such, and because the offer letter does not specify a method for calculating Plaintiff's commission, Defendant did not breach the employment contract by deducting transfer station expenses in calculating Plaintiff's commission payments. Defendants are therefore entitled to summary judgment on this issue.[38]

### b. Plaintiff's Breach of Contract Claim Regarding the Change in Plaintiff's Commission Rate

With regard to a reduction in her commission rate, Defendants assert that in 2013 and 2014, Riverbend began to experience cash flow issues, which required the implementation of cost-cutting measures. One such measure employed was to reduce Plaintiff's commission payments. According to Defendants, and confirmed by Plaintiff during her deposition, Densing met with Plaintiff and notified her that her commissions would be reduced in light of Riverbend's financial state.[39] Defendants claim that Densing decided to continue paying Plaintiff commissions based on all new and existing business, but at a lower rate of one percent, effective July 1, 2014.[40] On November 12, 2014, Plaintiff received her commission check for the month of July 2014 and the corresponding commission worksheet specifying that the commission was being calculated at a rate of one percent. Defendants assert that Plaintiff has admitted she knew as of November 2014 that her commission rate had been changed to one percent.[41] According to Defendants, their consistent calculation of Plaintiff's commission at a rate of one percent from July 2014 through

---

[38] It is undisputed that Plaintiff was aware her commissions were being calculated using the "gate rate," which included a reduction for transfer station expenses, but only challenged that calculation method once with regard to the first commission payment. Although the undisputed evidence also shows that Plaintiff questioned Defendants' failure to provide her with a 1% equity interest in 2013, but did not question the failure to provide the additional 1% equity interest in 2014 such that Defendants argue she likewise acquiesced with regard to the equity interest, the undersigned finds the acceptance of 36 commission payments over the course of 3 ½ years factually distinguishable for purposes of summary judgment.
[39] R. Doc. 20-1 at p. 5 (*citing* R. Doc. 20-4 at pp. 28-30).
[40] R. Doc. 20-1 at p. 6.
[41] R. Doc. 20-1 at p. 6 (*citing* R. Doc. 20-4 at pp. 38-39).

12

August 2015,[42] and Plaintiff's acceptance of such commission payments, clearly shows that the offer letter was modified by an oral agreement and/or the conduct of the parties.[43]

Defendants further assert that because Plaintiff was an at-will employee, a fact which Plaintiff does not contest, Riverbend could change her commission rate at any time. Defendants contend that the offer letter lacked any provision limiting Riverbend's ability to make changes to Plaintiff's compensation, including her commission rate, or requiring Riverbend to pay Plaintiff commissions at a rate of two percent during the entirety of her employment or for any particular length of time. Defendants argue that because Riverbend could terminate Plaintiff's employment at will, Riverbend could also change her commission rate or eliminate the commission payments at any time. Although Plaintiff claims that any changes to her commission rate were required to be reduced to a writing signed by the parties, Defendants rely on Louisiana law for the proposition that a written contract can be modified by an oral contract or by the conduct of the parties when the underlying contract is not required to be in writing.[44] Because there is no statutory requirement that offers of employment must be reduced to writing, Defendants argue the change to Plaintiff's commission rate also did not have to be reduced to writing. As such, Defendants assert Plaintiff's breach of contract claim based on the change in her commission rate should be dismissed. Because Plaintiff's claim for unpaid wages under the LWPS is based upon her claim for additional commissions under the terms of the offer letter, Defendants assert Plaintiff's claim for unpaid wages should also be dismissed.

---

[42] According to Defendants, the position of Business Development Manager was ultimately eliminated due to "cash flow problems" and Plaintiff's employment was terminated effective August 31, 2015. R. Doc. 20-1 at p. 7.
[43] R. Doc. 20-1 at p. 13.
[44] R. Doc. 20-1 at p. 12; *See, Shaw Constructors v. PCS Nitrogen Fertilizer LP*, 326 Fed. Appx. 860 (5th Cir. 2009) *Driver Pipeline Co., Inc. v. Cadeville Gas Storage, LLC*, 49,375 (La. App. 2 Cir. 10/11/14), 150 So.3d 492, 500; *Monroe v. Physicians Behavioral Hospital, LLC*, 49,248 (La. App. 2 Cir. 8/13/14), 147 So.3d 787, 795-96.

In opposition, Plaintiff claims she never agreed to the reduction from a commission rate of two percent to one percent. Although she was an at-will employee, it is Plaintiff's position that "the terms of her pay were locked in the four corners of a contract and must be paid for the time that she worked there."[45] While there were negotiations about the different terms, Plaintiff claims there was never a meeting of the minds on the reduction of her commissions.  As such, Plaintiff argues there is no agreement by the parties to Defendants' unilateral reduction in Plaintiff's salary in violation of the written agreement between the parties.  Although Defendants contend the parties agreed to an oral modification of the contract, Plaintiff testified during her deposition that she believed she would be paid according to the terms of the offer letter unless and until the parties entered into another written agreement modifying the terms of the offer letter.

Although the offer letter states that Plaintiff would receive two percent commissions on new and existing business, "The law is clear that written contracts may be modified by oral contracts and the conduct of the parties." *Driver Pipeline Co., Inc. v. Cadeville Gas Storage, LLC*, 49,375 (La. App. 2 Cir. 10/1/14), 150 So.3d 492, 500; *See*, *Grosjean v. Grosjean*, 45,529 (La. App. 2 Cir. 10/13/10), 50 So.3d 233, 244; *Smith v. Coffman*, 46,793 (La. App. 2 Cir. 2/8/12), 87 So.3d 137, 150.  Louisiana courts have also held that there is no statutory requirement that an employment contract be written. *Monroe v. Physicians Behavioral Hosp., LLC*, 49,248 (La. App. 2 Cir. 8/13/14), 147 So.3d 787, 797; *Mott v. Phillips*, 372 So.2d 223, 227 (La. 3 Cir. 1979) (citing cases).  "Even contracts that contain a provision specifying that it may only be modified in writing may be subsequently modified by oral agreement." *Schindler Elevator Corp. v. Long Prop. Holdings, L.L.C.*, 50,199 (La. App. 2 Cir. 11/18/15, 12), 182 So.3d 233, 241.  As such, any changes or modification made to the terms of the offer letter in this case were not required to be in writing.

---

[45] R. Doc. 21-1 at p. 8.

The undisputed evidence shows that the parties modified the terms of the offer letter by oral agreement and their actions. Plaintiff testified during her deposition that she knew her commission was being calculated at a rate of one percent as of November 2014 when she received her commission check and the corresponding worksheet for the month of July 2014.[46] Plaintiff testified that her monthly commission payments were calculated at a rate of one percent from July 1, 2014 through the termination of her employment on August 31, 2015.[47] Plaintiff also testified that she spoke to Densing about the change in her commission rate sometime in 2014,[48] but that she continued to accept her commission payments after her commission rate had been reduced to one percent. Similar to the Plaintiff's claims regarding the calculation of her commissions, Riverbend's consistent calculation of Plaintiff's commission at a rate of one percent from July 2014 through August 2015 and Plaintiff's acceptance of such commission payments after receiving Densing's explanation shows that terms of the offer letter were modified by the conduct of the parties. As a result, Defendants are entitled to summary judgment on Plaintiff's breach of contract claim regarding Defendants' reduction of Plaintiff's monthly commission rate, which includes Plaintiff's claims under the LWPS.

### 2. Plaintiff's Claim for Intentional Interference with a Contract

Plaintiff asserts that defendants Densing and McInnis intentionally interfered with her employment contract by terminating her employment with Riverbend. Plaintiff claims that an action against a corporate officer for intentional and unjustified interference with contractual relations requires proof of the following: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer's knowledge of the

---

[46] R. Doc. 20-4 at pp. 28-32, 38-39.
[47] R. Doc. 20-4 at pp. 28, 40.
[48] R. Doc. 30-4 at p. 28.

15

contract; (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer. *9 to 5 Fashions v. Spurney*, 538 So.2d 228, 234 (La. 1989). Plaintiff asserts that in the instant case: (1) there existed a contract; (2) both corporate officers had knowledge of the contract; (3) Defendants intentionally cancelled the contract; (4) Plaintiff's pay was cut because Defendants had made a bad deal that they could not afford; and (5) Plaintiff was terminated to avoid paying her the commissions and equity interest she had earned.[49] Defendants argue that because they have shown Plaintiff's breach of contract claims must be dismissed, her claim for intentional interference with a contract must also be dismissed. Defendants further assert that the claim must be dismissed because a claim for intentional interference with a contract must be brought against a corporate officer. Defendants argue it is undisputed that Riverbend is a limited liability company and Densing and McInnis were the managers of Riverbend. As such, Defendants argue that Plaintiff cannot obtain the relief sought against Densing or McInnis for intentional interference with a contract. Plaintiff did not address these arguments in her opposition to the Motion.

As all Plaintiff's claims for breach of contract have not been dismissed, Defendants' first argument with regard to tortious interference fails. Defendant's second argument on this issue, however, has merit. The jurisprudence from this Circuit shows that, "Tortious interference with contract was recognized in a limited fashion by the Supreme Court of Louisiana . . . and to date the holding has been restricted to the precise cause of action it explicates: that is a situation involving a corporation, an officer of the corporation, and a contract between the corporation and

---

[49] R. Doc. 21-1 at p.13.

a third party." *Magnolia Financial Group v. Antos*, CIV.A. 15-7144, 2016 WL 7407174, at *3 (E.D. La. Dec. 22, 2016) (quoting *Restivo v. Hanger Prosthetcs & Orthotics, Inc.*, 483 F.Supp. 2d 521, 536 (E.D. La. 2007)). As such, the court in *Magnolia* concluded that, "Plaintiff's allegations that Porges 'was a member and/or employee of Twin Towers and/or Porges and Eisenberg' are insufficient to bring his actions within the narrow cause of action articulated in *Spurney*, which is limited to officers of corporations, and does not include members or employees of LLCs." 2016 WL 7407174, at *3 (citing *M&D Mineral Consultants, LLC v. Wenting Li,* No. 12-2082, 2013 WL 883689, at *3 (W.D. La. Mar. 7, 2013)). According to the *Magnolia* court, "Louisiana courts have consistently declined to broaden the narrow scope of the cause of action." 2016 WL 7407174, at *3 (citing *Boudreaux v. OS Rest. Servs., L.L.C.*, 58 F.Supp.3d 634, 638 (E.D. La. 2014)).

Because a claim for intentional interference with a contract can only be brought against officers of a corporation and it is undisputed that Densing and McInnis are the members of a limited liability company, Defendants are entitled to summary judgment on Plaintiff's intentional interference claim.

### 3. Plaintiff's LUTPA Claim

The LUTPA prohibits, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." La. R.S. § 51:1405(A). "Louisiana has left the determination of what is an 'unfair trade practice' largely to the courts to decide on a case-by-case basis." *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993). *See also*, *Cheramie Services, Inc. v. Shell Deepwater Production, Inc.*, 35 So.3d 1053, 1059 (La. 2010) ("It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the statute's prohibition.") (citing *Dufau v. Creole Engineering, Inc.*, 465 So.2d 752, 758 (La. App. 5 Cir. 1985) (In order to recover under LUTPA a plaintiff must prove "some element of fraud,

17

misrepresentation, deception, or other unethical conduct" on the part of the defendant.)). "The courts have repeatedly held that, under this statute, the plaintiff must show the alleged conduct 'offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'" *Cheramie*, 35 So.3d at 1059 (citations omitted). The Louisiana Supreme Court has explained that, "the range of prohibited practices under LUTPA is extremely narrow." *Cheramie*, 35 So.3d at 1060. Further, the Fifth Circuit has held that "the statute does not provide an alternate remedy for simple breaches of contract. There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes." *Turner*, 989 F.2d at 1422. *See also, Innovative Sales, LLC v. Northwood Mfg., Inc.*, 07-30598, 2008 WL 3244114, at *6 (5th Cir. 2008) ("Innovative argues that the same actions taken by Northwood that support a breach of contract claim also support a LUTPA claim. This argument, however, is foreclosed by *Turner v. Purina Mills, Inc.*, wherein this court expressly acknowledged that LUTPA 'does not provide an alternate remedy for simple breaches of contract,' noting that '[t]here is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes.'").

Here, Plaintiff alleges that Defendants violated the LUTPA by failing to fulfill the promises set forth in the offer letter with respect to her compensation. Plaintiff asserts that Defendants' actions in reducing her commission rate, calculating her commission by deducting transfer station expenses and refusing to recognize that Plaintiff earned a two percent equity interest in Riverbend "evidence a clear intent by defendants to violate the contract with Plaintiff simply because the Defendants made a bad deal."[50] Defendants argue that because Plaintiff's breach of contract claims fail, her LUTPA claim must fail, as well. In addition, Defendants assert that Plaintiff's LUTPA claim is a simple breach of contract claim because there is no allegation of the type of

---

[50] R. Doc. 21-1 at p. 15.

egregious behavior contemplated by the LUTPA and there is no evidence that Riverbend's alleged failure to abide by the terms of the offer letter had an injurious effect on competition or consumers. Defendants argue that Riverbend's alleged failure to pay Plaintiff the additional commissions or recognize Plaintiff's equity position in Riverbend has no effect on consumers and that payment of those amounts would not foster competition in the marketplace. Defendants claim that the range of prohibited practices under the LUPTA is extremely narrow and Plaintiff's claim is not within the scope of activity prohibited by the LUTPA.

Because Plaintiff is alleging that Defendants engaged in unfair and deceptive trade practices by breaching the terms of the March 29, 2012 offer letter, her argument with regard to the LUPTA claim is merely a recitation of her breach of contract claims. *Nola Fine Art, Inc. v. Ducks Unlimited, Inc.*, 88 F.Supp.3d 602, 613 (E.D. La. 2015). Plaintiff "cannot manufacture a LUTPA violation by simply adding the words 'deceit' and 'misrepresentation'" to her breach of contract claim. *Id.*; *See, Shaw Indus. v. Brett*, 884 F.Supp. 1054, 1058 (M.D. La. 1995) (finding that "the relationship between the parties and the nature of the disagreement . . . is more analogous to a breach of contract dispute than one involving unfair or deceptive acts."). Although Plaintiff alleges that Defendants violated the LUTPA "by promising incentives to employees and then fraudulently breaching the promise to pay incentives once competitive industry goals were achieved,"[51] Plaintiff has merely restated the thrust of her breach of contract claims. Because Plaintiff's LUTPA claim is more akin to a breach of contract claim than the sort of "egregious" behavior contemplated by the LUTPA, dismissal of Plaintiff's claim under the LUTPA is appropriate. *See, Cooper v. Primary Care Solutions, Inc.*, CIV.A. 16-259-EWD, 2017 WL 1086186, at *9 (M.D. La. Mar. 21, 2017) (citing *Nussli US, LLC v. Nola Motorsports Host*

---

[51] R. Doc. 1 at ¶ 24.

*Committee, Inc.*, No. 15-2372, 2016 WL 4064011, at *11 (E.D. La. July 29, 2016) (granting motion to dismiss LUTPA claim against particular defendant where plaintiff did not plead "any false or misleading statements allegedly made by" the defendant and the core of plaintiff's allegations was "a claim that [defendant] failed to pay it the amount it was due under its contract . . . . However, the law is clear that LUTPA does not provide an alternate remedy for simple breaches of contract. [Plaintiff's] bare assertions of deceptive conduct on the part of [defendant] are insufficient to constitute deception, unethical conduct, or egregious behavior that would constitute a claim pursuant to LUTPA.")).

### III.   Conclusion

Based on the foregoing, **IT IS HEREBY ORDERED** that the Defendants' Motion for Summary Judgment[52] is **GRANTED in part** and **DENIED in part.**  The Motion is **DENIED** to the extent Defendants seek dismissal of Plaintiff's breach of contract claim concerning Defendants' refusal to recognize that Plaintiff earned a two percent equity interest in Riverbend during the course of her employment.  To the extent Defendants seek dismissal of the remainder of Plaintiff's claims for breach of contract, including under the Louisiana Wage Payment Statutes, as well as Plaintiff's claims for alleged violations of the Louisiana Unfair Trade Practices Act and intentional interference with a contract, the Motion is **GRANTED** and those claims are **DISMISSED with prejudice.**

Signed in Baton Rouge, Louisiana, on July 24, 2017.

                                        **ERIN WILDER-DOOMES**
                                        **UNITED STATES MAGISTRATE JUDGE**

---

[52] R. Doc. 20.